Matthew D. Ingber
Niketa K. Patel
Joaquin M. C de Baca
David Yolkut
**MAYER BROWN LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 506-2500
Email: mingber@mayerbrown.com
      npatel@mayerbrown.com
      jcdebaca@mayerbrown.com
      dyolkut@mayerbrown.com

*Attorneys for Defendant Cloudflare, Inc.*

Response Deadline: **November 5, 2024**
Reply Deadline: **January 8, 2025**
Related CM/ECF Docket Number: **1**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>    Debtors. | |
| In re:<br><br>MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS,<br><br>    Plaintiff,<br><br>    v.<br><br>CHRISTOPHER SPADAFORA and CLOUDFLARE, INC.,<br><br>    Defendant | Chapter 11<br>Case No. 22-10964 (MG)<br>(Jointly Administered)<br><br><br>Adversary Proceeding No. 24-03981 (MG) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT CLOUDFLARE, INC.'S MOTION TO DISMISS

---

[1] Pursuant to the Complaint, the Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 2

     A.     The Parties ........................................................................................................ 2

          1.     Cloudflare and Its Free Services .................................................. 2

          2.     Celsius's Rise and Fall ................................................................. 3

     B.     Celsius Invests In BadgerDAO .......................................................................... 4

     C.     BadgerDAO—Not Celsius—Utilizes Limited Free Services From
            Cloudflare ........................................................................................................ 5

     D.     Unknown Third-Party Criminals Hack BadgerDAO............................................ 7

     E.     Celsius Bungles Its Chance At Full Restitution.................................................... 8

LEGAL STANDARD............................................................................................................. 9

ARGUMENT.......................................................................................................................... 9

I.     CELSIUS FAILS TO STATE A NEGLIGENCE CLAIM ............................................ 10

     A.     Cloudflare Does Not Owe Celsius A Duty Of Care. ........................................... 10

     B.     Celsius's Failure To Allege A Duty Of Care Necessarily Means It Has
            Failed To Allege Any Breach By Cloudflare. ..................................................... 17

     C.     Celsius Fails to Plausibly Allege Proximate Causation. ...................................... 17

II.     CELSIUS FAILS TO STATE A GROSS NEGLIGENCE CLAIM .............................. 22

JURY TRIAL DEMAND ...................................................................................................... 25

CONCLUSION...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)..............................................................................................................9

*AT&T v. City of New York*,
83 F.3d 549 (2d Cir. 1996)...........................................................................9, 22, 23, 24

*Bashian & Farber, LLP v. Syms*,
2017 NY Slip Op 32964(U) (Sup. Ct., Westchester Cnty. 2017).............................12

*Bd. of Managers of 125 N. 10th Condo. v. 125 N. 10, LLC*,
42 Misc. 3d 1214(A) (Sup. Ct. Kings Cnty. 2014)....................................................16

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)...........................................................................................................9

*Canals v. Tilcon New York, Inc.*,
135 A.D.3d 683 (2016) ...................................................................................................17

*In re Celsius Network, LLC*,
No. 22-10964 (MG) (Jan. 31, 2023) ...............................................................................3

*Cheng v. T-Mobile USA, Inc.*,
2023 WL 6385989 (S.D.N.Y. Sept. 29, 2023)..............................................13, 14, 16

*Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*,
81 N.Y.2d 821 (1993) .....................................................................................................22

*Corley v. Vance*,
365 F. Supp. 3d 407 (S.D.N.Y. 2019)..........................................................................22

*Curley v. AMR Corp.*,
153 F.3d 5 (2d Cir. 1998)........................................................................................10, 22

*D'Amico v. Waste Mgm't of New York, LLC*,
2019 WL 1332575 (W.D.N.Y. Mar. 25, 2019).............................................................22

*Dains v. Bayer HealthCare LLC*,
2022 WL 16572021 (N.D.N.Y. Nov. 1, 2022) ..........................................................17

*Doe v. Guthrie Clinic Ltd.*,
22 N.Y.3d 480 (N.Y. 2014) ...........................................................................................14

## TABLE OF AUTHORITIES

(Continued)

**Page(s)**

*Dugue v. 1818 Newkirk Mgm't Corp.*,
301 A.D.2d 561 (2d Dep't 2003) ...............................................................................17

*E. States Health & Welfare Fund v. Philip Morris, Inc.*,
188 Misc. 2d 638 (Sup. Ct. N.Y. Cnty. 2000) .......................................................20

*In re Enron Corp.*,
292 B.R. 752 (Bankr. S.D.N.Y. 2002) ...................................................................25

*Faber v. Met. Life Ins. Co.*,
648 F.3d 98 (2d Cir. 2011)......................................................................................23

*Farash v. Cont'l Airlines, Inc.*,
574 F. Supp. 2d 356 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 7 (2d Cir. 2009)...................22, 23

*Hamilton v. Beretta U.S.A. Corp.*,
96 N.Y.2d 222 (2001) ....................................................................................11, 14, 15

*Hammond v. Bank of New York Mellon Corp.*,
2010 WL 2643307 (S.D.N.Y. June 25, 2010) ......................................................12

*King v. Diplomat Hosp. Grp., LLC*,
218 A.D.3d 454 (2nd Dep't 2023) ..........................................................................21

*Kinsey v. Cendant Corp.*,
2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005)................................................22, 24

*Kraus v. Lee*,
2015 WL 2354381 (E.D.N.Y. May 15, 2015) .......................................................12

*Lapidus v. State of New York*,
57 A.D.3d 83 (2d Dep't 2008).................................................................................17

*Martin v. City of New York*,
793 F. Supp. 2d 583 (E.D.N.Y. 2011) ...................................................................20

*McCollum v. Baldwin*,
688 F. Supp. 3d 117 (S.D.N.Y. 2023)..........................................................10, 14, 17

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
739 F. Supp. 2d 576 (S.D.N.Y. 2010)................................................................17, 18

*Mojica v. Gannett Co.*,
71 A.D.3d 963 (2d Dep't 2010) ..............................................................................14

## TABLE OF AUTHORITIES

(Continued)

**Page(s)**

*Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*,
930 F. Supp. 2d 532 (S.D.N.Y. 2013)......................................................................................24

*Novikova v. Greenbriar Owners Corp.*,
258 A.D.2d 149 (2d Dep't 1999)..........................................................................................21

*Parrott v. Coopers & Lybrand, LLP*,
263 A.D.2d 316 (1st Dep't 2000) ..........................................................................................12

*Pasternak v. Lab'y Corp. of Am.*,
892 F. Supp. 2d 540 (S.D.N.Y. 2012)....................................................................................22

*Pasternak v. Lab'y Corp. of America Holdings*,
807 F.3d 14 (2d Cir. 2015)....................................................................................................10

*Pink v. Rome Youth Hockey Ass'n*,
28 N.Y.3d 994 (2016) ...........................................................................................................20

*Polzer v. TRW, Inc.*,
256 A.D.2d 248 (1st Dep't 1998) ....................................................................................14, 16

*Pulka v. Edelman*,
40 N.Y.2d 781 (1976) ......................................................................................................11, 17

*Purdy v. Pub. Adm'r of Westchester Cnty.*,
72 N.Y.2d 1 (1988) ...............................................................................................................10

*Royal v. New York City Hous. Auth.*,
127 A.D.3d 534 (1st Dep't 2015) ..........................................................................................20

*In re Sears Holdings Corp.*,
2023 WL 3470475 (Bankr. S.D.N.Y. May 15, 2023)............................................................10

*In re Sony Gaming Networks & Consumer Data Sec. Breach Litig.*,
996 F. Supp. 2d 942 (N.D. Cal. 2014) ...................................................................................21

*Sterling Nat'l Bank v. J.H. Cohn LLP*,
2013 WL 4467401 (Sup. Ct. N.Y. Cnty. Aug, 20, 2013) .......................................................24

*Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP*,
586 F. Supp. 2d 119 (S.D.N.Y. 2008).....................................................................................24

*Toretto v. Donnelley Fin. Sols., Inc.*,
583 F. Supp. 3d 570 (S.D.N.Y. 2023).....................................................................................15

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*,
204 F. Supp. 2d 639 (S.D.N.Y. 2002)........................................................................25

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)........................................................................9

*Tzaras v. Evergreen Int'l Spot Trading, Inc.*,
2003 WL 470611 (S.D.N.Y. Feb. 25, 2003)..........................................................10, 12

*Ventricelli v. Kinney Sys. Rent A Car, Inc.*,
45 N.Y.2d 950 (1978) ...............................................................................................22

*Wendt v. Bent Pyramid Prods., LLC*,
108 A.D.3d 1032 (4th Dep't 2013)............................................................................16

*Wireless Ink Corp. v. Facebook, Inc.*,
787 F. Supp. 2d 298 (S.D.N.Y. 2011).....................................................................9, 23

**Statutes**

28 U.S.C. § 157.........................................................................................................25

**Other Authorities**

Aiden Slaven and Kevin Werbach, *Decentralized Autonomous Organizations
Explained*, World Economic Forum (Jan. 17, 2023),
https://www.weforum.org/agenda/2023/01/everything-you-need-to-know-
daos/ ..........................................................................................................................4

Daniel Joel, *Staking Crypto: A Beginner's Guide on How to Stake Crypto in 2024*,
Bitcoin Market Journal (Oct. 7, 2024),
https://www.bitcoinmarketjournal.com/staking-cryptocurrency/ ............................5

Fed. R. Bankr. P. 7012(b) ............................................................................................2

Fed. R. Civ. P. 12(b)(6)..........................................................................................2, 9, 25

RESTATEMENT (SECOND) OF TORTS § 433 ................................................................18, 20

Steven Ehrlich, *What is DeFi?*, Forbes (Mar. 10, 2023, updated Jan. 24, 2024),
https://www.forbes.com/sites/digital-assets/article/what-is-defi/ ............................4

**INTRODUCTION**

Celsius allegedly suffered a significant financial loss when third-party criminals hacked BadgerDAO, a cryptocurrency platform with which Celsius invested. Celsius itself admits that BadgerDAO "failed to implement basic security protocols that could have prevented the hack." Complaint ("Compl.") ¶ 12. Yet instead of pursuing a claim against BadgerDAO for its alleged negligence, or against the hackers who perpetrated the attack, Celsius's Litigation Administrator has set its sights on Cloudflare, a leading provider of cybersecurity services to millions of websites, because BadgerDAO signed up for a free version of Cloudflare's services. In this action, Celsius seeks tens of millions of dollars in damages from a company with whom it had no direct contacts or relationship, who owed it no duty, and who was paid no money for the services that are now alleged to be the crux of the harm. This motion to dismiss should be granted to avoid a breathtaking and unjustified expansion of tort law.

Celsius's negligence claim fails at the outset because Cloudflare did not owe any duty of care to Celsius. It is well-settled that New York law does not impose a generalized duty to protect others from injuries caused by third parties, such as the criminal hackers that infiltrated BadgerDAO's platform, unless there is a "special relationship" between either the defendant and the criminals, or the defendant and the injured party. Cloudflare is not alleged to have any relationship with the third-party hackers or with Celsius, "special" or otherwise. Indeed, Celsius does not allege a single dealing with Cloudflare, or that it provided any sensitive or financial information *to Cloudflare*, let alone that Cloudflare disclosed it. Celsius's "customer of a customer" theory is wrong as a matter of law, and it cannot shoehorn itself into a special relationship with Cloudflare by vaguely alleging that it was a "governing member" of BadgerDAO, albeit one that played no role in BadgerDAO's operations. The duty of care analysis begins and ends with Celsius's failure to allege any relationship with Cloudflare.

Because Celsius cannot establish that Cloudflare owed a duty of care to non-customers, it necessarily follows that there was no *breach* of that duty by Cloudflare. In any event, Celsius has failed to plausibly allege proximate causation. Celsius's own allegations highlight significant intervening conduct by a slew of actors—including BadgerDAO, the third-party criminal hackers, and Celsius itself—that collectively and individually sever any possible causal chain and render Celsius's harm entirely unforeseeable to Cloudflare.

Finally, Celsius's gross negligence claim fares even worse. Celsius does not come within even a stone's throw of alleging that Cloudflare had a reckless disregard for the rights of others or engaged in intentional wrongdoing—the heightened degree of culpability required for a gross negligence claim under New York law.

For these reasons, and as described in further detail below, Cloudflare respectfully requests that the Court dismiss the claims against Cloudflare under Federal Rule of Civil Procedure 12(b)(6).[2]

## STATEMENT OF FACTS

The Complaint was filed by Mohsin Meghji (the "Litigation Administrator") on behalf of the estates of the debtors and debtors-in-possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "Celsius").

### A.     The Parties

#### 1.     Cloudflare and Its Free Services

By way of background, Cloudflare is a "leading, publicly-traded, connectivity cloud company," Compl. ¶¶ 7, that empowers organizations to make their employees, applications, and networks faster and more secure everywhere, while reducing complexity and cost. In addition to

---

[2] Pursuant to Bankruptcy Rule 7012(b), Cloudflare respectfully states that it does not consent to entry of final orders or judgment by the bankruptcy court.

offering high-end services to Fortune 500 companies, governments, and other large enterprises, Cloudflare makes many of its services widely available for free or low costs. Cloudflare's free plan—which Celsius alleges was used by BadgerDAO—provides basic website performance and security features by routing web traffic through Cloudflare's global CDN (content delivery network). Cloudflare's free services help to optimize performance (*e.g.*, reduce page load times) and block threats including DDoS (distributed denial-of-service) attacks. Cloudflare has millions of free customers, protecting approximately 20% of the web from more than 10 million DDoS attacks each year. Customers may quickly sign up online for Cloudflare's free services, and many first do so when under active DDoS attack.

### 2.   Celsius's Rise and Fall

Celsius avers that it was once a global leader in cryptocurrency finance. Compl. ¶¶ 4, 26. Celsius's customers would deposit their cryptocurrency digital assets onto its platform in exchange for weekly interest, and Celsius then lent those assets to third parties "to earn yield." *Id.* ¶ 25.

Although Celsius initially saw rapid growth, that did not last. *Id.* ¶¶ 26-27. The Litigation Administrator assiduously avoids discussing Celsius's own mismanagement, which was exhaustively detailed in the court-appointed Examiner's Final Report.[3] In the Complaint's sanitized telling, in the spring of 2022, the cryptocurrency market's notorious swings caught up with it and Celsius "faced an internal liquidity crisis." *Id.* ¶¶ 28-29. Customers, nervous about Celsius's stability in light of the collapse of the TerraUSD cryptocurrency token (in which Celsius heavily invested), withdrew their assets from the Celsius platform in droves. *Id.* ¶ 28. Celsius was unable to address the volume of customer withdrawal requests due to insufficient assets, and faced

---

[3] *See* ECF No. 1956, *Final Report of Shoba Pillay, Examiner*, *In re Celsius Network, LLC*, No. 22-10964 (MG) (Jan. 31, 2023), at 3-5 ("The business model Celsius advertised and sold to its customers was not the business that Celsius actually operated . . . Behind the scenes, Celsius conducted its business in a starkly different manner than how it marketed itself to its customers in every key respect.").

more than one billion dollars in loans collateralized by cryptocurrency assets that had plummeted in value. *Id.* ¶ 29. By June, Celsius stopped paying its customers, and it filed for Chapter 11 bankruptcy in this Court the next month. *Id.* ¶¶ 30-31.

In early 2024, Celsius emerged from bankruptcy. *Id.* ¶ 2. The Litigation Administrator has sought to "maximiz[e] distributions" to Celsius's stakeholders by filing adversary proceedings, like this one, against various entities under various theories. *Id.* ¶ 33. To date, he has filed more than 2,000 actions.

### B.    Celsius Invests In BadgerDAO

In early 2021, Celsius began investing its customers' cryptocurrency assets with BadgerDAO. *Id.* ¶ 45. BadgerDAO is a Decentralized Autonomous Organization ("DAO")[4] founded by Defendant Christopher Spadafora. *Id.* ¶ 34. BadgerDAO allows investors to use Bitcoin as collateral across decentralized finance, or DeFi, applications.[5] *Id.* Celsius's CEO met with Spadafora in January 2021, and Celsius began its investment in BadgerDAO shortly thereafter. *Id.* ¶¶ 46-52. Throughout 2021, Spadafora kept in touch with Celsius's employees about BadgerDAO's technical details, protocols, and products, including the security of its platform. *Id.* Spadafora made several assurances about the security of the platform, indicating to Celsius that

---

[4] A DAO is intended to be an organization with no central leader, with decision-making distributed across the organization's members. Compl. ¶ 35; Aiden Slaven and Kevin Werbach, *Decentralized Autonomous Organizations Explained*, World Economic Forum (Jan. 17, 2023), https://www.weforum.org/agenda/2023/01/everything-you-need-to-know-daos/. Many of the actions of the organization are typically automated by a system of rules, as opposed to executed by individual persons. Compl. ¶ 35. In reality, however, many DAOs—including BadgerDAO—are not fully decentralized, and there are involved community members or governance bodies within the DAO that typically manage the vast majority of operations. *Id.* ¶ 36.

[5] Bitcoin is a cryptocurrency. Decentralized finance, or DeFi, is a financial system that allows users to conduct financial transactions on blockchains without relying on intermediaries such as brokerages, exchanges or banks. Simply put, DeFi is the environment that facilitates Bitcoin transactions between parties. *See* Steven Ehrlich, *What is DeFi?*, Forbes (Mar. 10, 2023, updated Jan. 24, 2024), https://www.forbes.com/sites/digital-assets/article/what-is-defi/.

this was a priority for BadgerDAO. *Id.* Celsius trusted Spadafora as the main representative and "mouthpiece" for BadgerDAO developers and community members. *Id.* ¶ 49.

Celsius ultimately bought "BADGER" tokens[6] and "staked" them in the "BADGER" vault,[7] and then placed hundreds of Bitcoins in BadgerDAO's Sett Vault to earn yield. *Id.* ¶¶ 52-53. Celsius used the BadgerDAO app, a software tool created and maintained by BadgerDAO developers, to access BadgerDAO's products and services and to approve transactions. *Id.* ¶ 40. By accessing the developer-end of the app, BadgerDAO developers had the power to shape and change the app's features and functions, including the "type of transactions available to customers" such as Celsius. *Id.* The Complaint alleges that the third-party hackers ultimately gained access to a developer's account and inserted "rogue" transactions on the app that led to the theft of Celsius's assets. *Id.* at ¶¶ 54-69.

Celsius alleges that it is a "governing member" of BadgerDAO by virtue of its possession of governance tokens, *see id.* at ¶¶ 35, 81, but it did not have any say or control over how BadgerDAO ran its operations, developed its platform, negotiated contracts with service providers, or communicated with users. *Id.* ¶ 36. All of those day-to-day responsibilities were instead handled by more active and influential community members, including and especially its founder, Defendant Spadafora. *Id.* ¶¶ 6, 36.

### C.   BadgerDAO—Not Celsius—Utilizes Limited Free Services From Cloudflare

Celsius alleges that BadgerDAO used Cloudflare's free online tools to "secure access to . . . the BadgerDAO API" (Application Programming Interface), which Celsius describes as allowing

---

[6] The BADGER token is allegedly "used for governance purposes and distribution of rewards to BadgerDAO users." *Id.* ¶ 39.

[7] "Staking" means leaving a certain amount and type of cryptocurrency in a specific digital wallet and locking it in place for a predetermined amount of time in order to earn passive returns. *See* Daniel Joel, *Staking Crypto: A Beginner's Guide on How to Stake Crypto in 2024*, Bitcoin Market Journal (Oct. 7, 2024), https://www.bitcoinmarketjournal.com/staking-cryptocurrency/.

developers "to perform actions such as changing the user interface of the BadgerDAO app . . . changing the type of transactions available to customers, or even changing the type of underlying transaction performed in response to a customer's prompt."[8] *Id.* ¶¶ 40-41. Celsius asserts that to "access the BadgerDAO API," a developer first required an "API key," which Celsius claims is "a passphrase that Cloudflare would issue for BadgerDAO developers." *Id.* ¶ 41. Celsius asserts that the passphrase was issued upon creation of a Cloudflare account, but was only activated by Cloudflare if the developer had a "BadgerDAO-issued email address" and verified it by clicking the unique email "verification link" sent to the developer's "BadgerDAO-issued e-mail address." *Id.* ¶ 42. Celsius thus alleges that the API key would not work until the developer "click[ed] the verification link." *Id.* ¶¶ 42-43. The Complaint alleges that the BadgerDAO developers would then use the API key to access the "developer-end" of the BadgerDAO platform and make modifications to the user interface of the BadgerDAO app as needed. *Id.* ¶¶ 40, 92. Beyond its description of API key creation, the Complaint does not describe any other products or services purportedly provided by Cloudflare to BadgerDAO.

Celsius also does not allege that it knew that Cloudflare was providing any services to BadgerDAO, even though it claims to be a BadgerDAO "member." *Id.* ¶ 81. And although Celsius alleges, "[u]pon information and belief," that there is a contract between Cloudflare and BadgerDAO, *id.* ¶ 41, it does not itself claim any type of relationship, contractual or otherwise, with Cloudflare. It also does not suggest that Cloudflare had access to, managed, stored, or otherwise handled *any* information, let alone personal or sensitive information, of Celsius, Celsius's customers, or any other users of the BadgerDAO platform. *Id.* Whereas Celsius describes

---

[8] Celsius's factual allegations regarding, among other things, BadgerDAO's use of Cloudflare's free services are inaccurate and at times incoherent. But even taking them as true for purposes of this pleading motion, as Cloudflare must and presents here, they do not support a cause of action against Cloudflare.

its communications with BadgerDAO at length, *see id.* ¶¶ 45-53, Celsius conspicuously does not allege *a single interaction, communication, or transaction* between itself and Cloudflare. Nor does Celsius allege that Spadafora ever even mentioned Cloudflare at any point during his discussions with Celsius throughout 2021. *Id.*

### D.   Unknown Third-Party Criminals Hack BadgerDAO

Celsius alleges that in November and December 2021, anonymous third-party criminal hackers "inject[ed] malicious code in the Badger API," ultimately absconding with approximately $130 million in user funds. *Id.* ¶¶ 54-56. The malicious code intercepted legitimate transactions and instead prompted BadgerDAO users to authorize transfer of *all* tokens to the hacker's address. *Id.* ¶ 55. Certain users, including Celsius, did approve these rogue requests, resulting in the funds being transferred to the attackers. *Id.* ¶ 68. As part of the heist, the thieves made off with 900 Bitcoin that Celsius had deposited, worth more than $50 million. *Id.* ¶ 56.

According to Celsius, Spadafora and his team at BadgerDAO had "failed to implement basic security protocols *that could have prevented the hack on BadgerDAO's end*, such as rotating key passphrases—a common security practice that Mr. Spadafora implemented after the hack." *Id.* ¶ 12 (emphasis added). Following the hack, Spadafora and the BadgerDAO team made several critical changes to their security measures, including the adoption of multifactor authentication, password changes, and the regular rotation of API keys. *Id.* ¶ 69. BadgerDAO did so after "recognizing that *its* security measures had been inadequate." *Id.* (emphasis added).

Celsius's allegation against Cloudflare boils down to its assertion that Cloudflare should have known that rogue users could create API keys for BadgerDAO accounts "before email verification was completed," and "then wait for the email to be verified" by a legitimate BadgerDAO user to complete the verification process for that account, "which would in turn activate the API key." *Id.* ¶ 44, 60. As its sole support, Celsius points to a thread in an online

7

support forum from September 27, 2021, in which two anonymous users—neither allegedly connected to Celsius or BadgerDAO—discussed this possibility in connection with their own accounts (again, unrelated to Celsius or BadgerDAO). *Id*. ¶¶ 60-61.

Celsius alleges that three unauthorized BadgerDAO developer accounts were created *before* the online support forum discussion from late September 2021. *Id*. ¶ 65. One of these unauthorized accounts was verified "unknowingly" by a BadgerDAO developer. *Id*. Celsius notably does not allege that any of these three accounts were actually used in the criminal hack, which occurred in November and early December 2021. *Id*. ¶¶ 66-68. It also does not allege that Cloudflare's email verification and API password generation worked in any way other than as intended. *Id.* Celsius instead alleges only that **BadgerDAO** "failed to implement basic security protocols that could have prevented the hack on BadgerDAO's end." *Id.* ¶ 12.

### E.      Celsius Bungles Its Chance At Full Restitution

Following the hack, BadgerDAO attempted to recover the stolen funds in three tranches. *Id.* ¶ 70. Through the first tranche, 37% of affected users received a full refund. *Id.* ¶ 71. A second tranche restored the assets of another 17% of users. *Id.* ¶ 72. The third tranche involved the creation of a "remedial token" (called "remBadger tokens") and a progressive restitution program over a two-year period. *Id.* ¶ 73. Through this process, Celsius recovered nearly 90 Bitcoin in restitution, which was worth approximately $3.8 million at the time of recovery. *Id.* ¶ 74. Although BadgerDAO allocated 901 remedial "remBadger tokens" to Celsius, a Celsius employee mistakenly withdrew all of them prematurely, resulting in an additional recovery to Celsius of $2.1 million, but a forfeiture of any further recoveries under BadgerDAO's restitution program. *Id.* ¶¶ 75-77. Notably, BadgerDAO itself never sued Cloudflare in connection with the hack.

8

**LEGAL STANDARD**

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570, (2007)). Courts require more than just "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id*. Instead, "the plausibility requirement 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim].'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 194 (S.D.N.Y. 2022) (quoting *Twombly*, 550 U.S. at 556). Moreover, a plaintiff can "plead himself out of court by alleging facts which show that he has no claim." *Wireless Ink Corp. v. Facebook, Inc.*, 787 F. Supp. 2d 298, 307 (S.D.N.Y. 2011).

**ARGUMENT**

As discussed more fully below, Celsius's negligence claim meets none of the three required elements. ***First***, Celsius fails to sufficiently allege a duty of care. New York law imposes no generalized duty to protect others from injuries caused by third parties, and Celsius has not alleged that it had a relationship of any kind with Cloudflare sufficient to deviate from that general rule. ***Second***, without a duty, there can be no breach. ***Third***, Celsius has failed to plausibly plead that Cloudflare proximately caused any injury; on the contrary, it alleges an unforeseeable causal chain that is peppered with the conduct of various intervening actors, including BadgerDAO, criminal hackers, and even Celsius itself. Celsius's gross negligence claim fails for these same three reasons, plus a fourth: Celsius's bare-bones allegations do not even approach the type of "reckless conduct" or "intentional wrongdoing" needed to sustain the heightened burden of a gross negligence claim. *AT&T v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996).

9

## I.  CELSIUS FAILS TO STATE A NEGLIGENCE CLAIM

To plead a *prima facie* cause of action for common-law negligence under New York law, a plaintiff must adequately allege that: "(1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached the duty; and (3) plaintiff suffered damage as a proximate result of that breach." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998).[9] Celsius's first cause of action against Cloudflare fails because it has not met, and cannot meet, any of these requisite elements.

### A.  Cloudflare Does Not Owe Celsius A Duty Of Care.

The negligence inquiry begins, and in this case should end, with the threshold question of the duty of care, for if "the defendant owes no duty to the plaintiff, the action must fail." *Pasternak v. Lab'y Corp. of America Holdings*, 807 F.3d 14, 19 (2d Cir. 2015). Whether Cloudflare owes a legally cognizable duty to Celsius "is a question of law that is properly before this Court on a motion to dismiss." *Tzaras v. Evergreen Int'l Spot Trading, Inc.*, 2003 WL 470611, at *5 (S.D.N.Y. Feb. 25, 2003).

As the Complaint itself shows, Cloudflare has no relationship with Celsius—contractual, special, or otherwise—that would give rise to a duty of care. Indeed, Celsius has failed to allege a single interaction, at any time, between Cloudflare and Celsius. *See* Factual Background, § C. This fact alone dooms Celsius's negligence cause of action, because New York law does not impose a generalized "duty to protect others from injuries caused by third parties," such as the criminal hackers that infiltrated BadgerDAO's platform. *See*, *e.g.*, *McCollum v. Baldwin*, 688 F. Supp. 3d 117, 131 (S.D.N.Y. 2023); *Purdy v. Pub. Adm'r of Westchester Cnty.*, 72 N.Y.2d 1, 8 (1988)

---

[9] A bankruptcy court applies the choice-of-law rules of the forum state (here, New York), *see In re Sears Holdings Corp.*, 2023 WL 3470475, at *5 n.3 (Bankr. S.D.N.Y. May 15, 2023), and Celsius does not allege that any other state's laws apply. On the contrary, Celsius alleges that jurisdiction lies in this Court in part because Defendants purposefully availed themselves of the laws of the State of New York by transacting business in the State. Compl. ¶ 23.

("[C]ommon law in the State of New York does not impose a duty to control the conduct of third persons to prevent them from causing injury to others; liability for the negligent acts of third persons generally arises when the defendant has authority to control the actions of such third persons").

Although it is difficult to discern a cogent theory of liability from the Complaint, to the extent Celsius is suggesting that Cloudflare owed a general duty of care to all who interacted with platforms and websites that used Cloudflare's services, that is wrong as a matter of law. Under New York law, "[t]he injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her, for '[w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.'" *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001) (citation omitted). And that makes sense, as any other rule would risk subjecting the defendant—particularly a service provider like Cloudflare that offers free or low-cost services to anyone who signs up online—"to limitless liability to an indeterminate class of persons conceivably injured by any negligence in that act." *Id.* As a policy matter, courts should thus "be mindful of the precedential, and consequential, future effects of their rulings, and limit the legal consequences of wrongs to a controllable degree.'" *Id.* (citation omitted). Were it otherwise, "it is difficult to conceive of the bounds to which liability logically would flow." *Pulka v. Edelman,* 40 N.Y.2d 781, 786 (1976).

Celsius alleges nonetheless that Cloudflare owed a "duty to implement adequate security protocols for the issuance of API keys" not just to BadgerDAO—which utilized Cloudflare's free services—but also to "all [BadgerDAO's] governing members, including Celsius." Compl. ¶¶ 81-82, 99; *see also id.* ¶ 85 (alleging that "Cloudflare breached its duty to BadgerDAO, and consequently, its duty to Celsius"). Celsius's implausible position appears to be that any duty that

11

Cloudflare may have owed to BadgerDAO flowed through to BadgerDAO's alleged "governing members" as well, with whom Cloudflare had no contact, contract, or dealings.[10] That attenuated theory does not save the negligence claim.

As discussed below (at p. 16), Celsius's vague reference to being a "governing member" does not establish any kind of meaningful relationship even between Celsius and BadgerDAO. But regardless of the nature of Celsius's relationship with **BadgerDAO**, that does not translate to a direct relationship with Cloudflare. And where, as here, the defendant has no alleged contacts or relationship with the plaintiff, New York courts routinely dismiss negligence causes of action for failure to plausibly allege that a duty of care exists. *See*, *e.g.*, *Tzaras*, 2003 WL 470611, at \*5 (dismissing negligence claim because bank owed no duty of care to a non-customer to prevent third-party fraud); *Kraus v. Lee*, 2015 WL 2354381, at \*4 (E.D.N.Y. May 15, 2015) (dismissing negligence claim because "the Complaint fails to contain any facts sufficient to support a claim that [broker] Interactive owed a duty to plaintiff since plaintiff has not alleged that he was a customer of Interactive"); *Hammond v. Bank of New York Mellon Corp.*, 2010 WL 2643307, at \*9 (S.D.N.Y. June 25, 2010) (finding no duty of care where Plaintiffs had no "direct dealings" with Defendant but instead "had relationships (only) with institutional clients of Defendant," and "Plaintiffs gave their personal data over to those entities, which, in turn, forwarded the data to Defendant (which stored the data on the tapes that ultimately were lost or stolen"); *Parrott v. Coopers & Lybrand, LLP*, 263 A.D.2d 316, 319-20 (1st Dep't 2000) ("accountants do not have a duty to the public at large" and the sound rationale for limiting the "duty of care" to non-customers is to prevent "liability by a limitless class of aggrieved parties"); *Bashian & Farber, LLP v. Syms*,

---

[10] Celsius notably does not assert any breach of contract claim against Cloudflare, so it presumably is not relying on an argument that Cloudflare's contractual obligations to BadgerDAO (arising from Cloudflare's self-serve terms of service, agreed to by all free users) flow through to Celsius.

2017 NY Slip Op 32964(U) at 6 (Sup. Ct., Westchester Cnty. 2017) ("[P]laintiffs have not demonstrated that a duty owed by Lynch to his client Syms could be extended to an unknown third party, such as plaintiffs").

*Cheng v. T-Mobile USA, Inc.* is particularly instructive. In *Cheng,* a third-party scam artist allegedly hijacked a T-Mobile line of service belonging to a T-Mobile customer through a "SIM-swap attack," impersonated that individual over the Telegram messaging service, and convinced the plaintiff, a cryptocurrency holder, to transfer 15 Bitcoin worth approximately $750,000 to a digital wallet. 2023 WL 6385989, at *1 (S.D.N.Y. Sept. 29, 2023). Unable or unwilling to sue the criminal behind the scam, the plaintiff instead sued T-Mobile, the mobile service provider that allegedly allowed the "SIM-swap attack" to occur. As here, the plaintiff alleged that T-Mobile was "on notice of the possibility" of another "SIM-swap attack" and thus knew that third parties could be impacted, yet allegedly failed to prevent the criminal conduct from occurring. *Id.* at *3. But the court dismissed the negligence claims against T-Mobile because, as here, the plaintiff failed to show that he had any "relationship, contractual or otherwise . . . with T-Mobile." *Id.* at *3-4. Like Celsius, who alleges that "it was foreseeable [to Cloudflare] that malicious actors may have gained access" to Celsius's accounts, *see* Compl. ¶ 84, the plaintiff in *Cheng* likewise submitted that T-Mobile "owe[d] a duty of care to foreseeable victims who transact business with legitimate T-Mobile customers." 2023 WL 6385989, at *3. The court squarely rejected that argument, too, finding that the "mere allegation that [the plaintiff] was a foreseeable victim does not, standing alone, create a duty of care owed . . . by T-Mobile." *Id.* As the court reasoned, extending a defendant's duty of care to "non-customers," whether foreseeable or not, is particularly untenable and contrary to public policy when the defendant "provide[s] basic services to large swathes of the

13

population." *Id.* at \*4. That same logic applies here too, as Cloudflare offers free services to millions of websites and users across the Internet.

To be sure, New York law recognizes an exception to the general rule—*i.e.*, that there is no duty to protect others from injuries caused by third parties—where a "special relationship exists between the defendant and the plaintiff." *McCollum*, 688 F. Supp. 3d at 131. A "special relationship" arises from "a relationship either between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others." *Hamilton*, 96 N.Y.2d at 233. As the Court of Appeals has explained, "key" to the inquiry is whether "the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Id*.

Celsius has wholly failed to allege either form of "special relationship," as Cloudflare had no contacts or dealings either with the criminal hackers or with Celsius. *Polzer v. TRW, Inc.*, 256 A.D.2d 248, 248 (1st Dep't 1998) (plaintiffs "failed to state a cause of action in negligence, because [defendants] BNY and Mobil had no special relationship either with the imposter who stole the plaintiffs' credit information and fraudulently obtained credit cards, or with plaintiffs, with whom they stood simply in a creditor/debtor relationship"). Starting with the third-party tortfeasor, Cloudflare is not alleged to have any relationship with, let alone "sufficient authority and control over," the criminal hackers that infiltrated BadgerDAO's API. *See* Factual Background, § D; *see also Mojica v. Gannett Co.*, 71 A.D.3d 963, 965 (2d Dep't 2010) ("[A]n entity has no duty to control a third party's conduct so as to prevent injury to another unless special circumstances exist in which the entity has sufficient authority and control over the conduct of that third party."); *Doe v. Guthrie Clinic Ltd.*, 22 N.Y.3d 480, 482-85 (N.Y. 2014) (rejecting plaintiff's

14

argument that a medical corporation was liable for unauthorized disclosure of a patient's medical information by one of its employees, limiting liability to situations in which the corporation had the means to control the employee's behavior).

Moving to Cloudflare's relationship with Celsius, a customer of a customer, Cloudflare was plainly not in the "best position" to protect Celsius's accounts, *see Hamilton*, 96 N.Y.2d at 233, merely because **BadgerDAO** signed up online for Cloudflare's free services. Compl. ¶¶ 41-44, 99. If anyone, it was BadgerDAO who was in the "best position" to protect ***its own*** investors' accounts—as to which it had access to and control over—from malicious third-party actors. As Celsius expressly admits, it was BadgerDAO—and not Cloudflare—that allegedly "failed to implement basic security protocols that could have prevented the hack." *Id.* ¶ 12. It makes no sense for Celsius to point right past BadgerDAO to Cloudflare, particularly when even BadgerDAO did not file any lawsuit against Cloudflare and where the Complaint itself acknowledges that BadgerDAO was responsible for "matters related to Celsius's investments into BadgerDAO, including the security of Celsius's funds on the BadgerDAO platforms." *Id.* ¶ 98; *see also id.* ¶ 69 (detailing the multiple security measures that BadgerDAO put in place following the hack, including multifactor authentication, password changes, and rotating API keys).

Further underscoring the lack of a "special relationship" here, Cloudflare was not provided with any personal information or data belonging to Celsius. *Cf. Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 593-94 (S.D.N.Y. 2023) (denying motion to dismiss negligence claim in data-breach case because defendant Mediant obtained Plaintiffs' "sensitive shareholder information" and "personally identifiable data," but cautioning that Mediant's "potential liability is limited to the individuals whose personal information it obtained while providing its services"). The only alleged "sensitive information" that Cloudflare had access to belonged to BadgerDAO,

15

and there are no factual allegations that Cloudflare obtained Celsius's personal or identifying information. *Compare id. with* Compl. ¶¶ 82-84.

Finally, even putting aside that being a "governing member" of BadgerDAO would not create a "special relationship" with Cloudflare, Celsius's Complaint does not even establish that its relationship with BadgerDAO went beyond that of any customer. Celsius provides no facts substantiating that it is indeed a "governing member," a nebulous term that the Complaint never defines. At most, Celsius claims to have purchased BADGER tokens and invested certain assets on BadgerDAO's platform. *See* Factual Background, § C. And in fact, Celsius ***expressly disclaims*** an active role in the governance and management of the BadgerDAO organization. *Id.* Celsius admits that it had no management responsibilities whatsoever, and that only "the most involved community members" like Spadafora handled the DAO's daily administration, platform development, contract negotiations, and user communications. Compl. ¶ 36. Celsius never alleges that it voted on any BadgerDAO initiatives, including on BadgerDAO's choice to avail itself of Cloudflare's free services. Compl. ¶ 35. How Celsius became a "governing member" of BadgerDAO, when it did so, or what that even means, the Complaint never says. *Id.*

In short, in the absence of any direct relationship between Celsius and Cloudflare, let alone a "special relationship," Celsius's negligence claim fails for lack of a cognizable legal duty.[11] *See, e.g., Cheng*, 2023 WL 6385989, at \*4 (dismissing complaint that "does not allege [plaintiff] had any relationship with [defendant], much less a special one"); *Polzer*, 256 A.D.2d at 248 (similar).

---

[11] Celsius appears to allege that an undefined "industry standard" imposes on Cloudflare a duty of care "for the safety of others." Compl. ¶ 87. It is well-settled, however, that "industry standards" are insufficient to give rise to an independent duty to a third party. *See, e.g., Wendt v. Bent Pyramid Prods., LLC*, 108 A.D.3d 1032, 1033 (4th Dep't 2013) ("We reject plaintiff's contention that industry standards or the rules and regulations of FINRA imposed a duty of care on [defendant] sufficient to support a private cause of action under New York common law for negligent supervision."); *Bd. of Managers of 125 N. 10th Condo. v. 125 N. 10, LLC*, 42 Misc. 3d 1214(A), at \*14 (Sup. Ct. Kings Cnty. 2014) (dismissing professional malpractice claim that defendant "breached its duty of care to ensure that the Building was designed and constructed in accordance with . . . normal industry standards" where "plaintiff had no contractual relationship with [defendant], nor any relationship approaching privity").

16

**B.      Celsius's Failure To Allege A Duty Of Care Necessarily Means It Has Failed To Allege Any Breach By Cloudflare.**

The Complaint alleges that "Cloudflare breached its duty to BadgerDAO, and consequently, its duty to Celsius" by issuing (inactive) API keys before the completion of email account verification and not alerting BadgerDAO's users of a potential "vulnerability" in this regard. Compl. ¶ 85. New York law, however, is clear: "in the absence of duty, there is no breach and without a breach there is no liability." *Pulka,* 40 N.Y.2d at 782; *Dugue v. 1818 Newkirk Mgm't Corp.*, 301 A.D.2d 561, 562 (2d Dep't 2003). For all of the reasons discussed above, Cloudflare owed no duty of care to Celsius. *See* Argument § I(A). And because no duty of care existed, it follows that there could have been no breach of that non-existent duty. *See McCollum*, 688 F.Supp.3d at 132 ("Because [defendant] owed no duty to Plaintiffs, the Court does not need to assess the other *prima facie* elements of Plaintiffs' negligence claims."). Celsius thus fails to adequately plead the second required element of a negligence cause of action against Cloudflare.

**C.      Celsius Fails to Plausibly Allege Proximate Causation.**

Celsius's negligence claim fails for the additional reason that Celsius has not plausibly alleged that any actions of Cloudflare proximately caused its alleged damages. *See Dains v. Bayer HealthCare LLC*, 2022 WL 16572021, at *10 (N.D.N.Y. Nov. 1, 2022) (dismissing negligence claim where plaintiff "fail[ed] to allege factual allegations regarding how any [] conduct actually led to her injuries"). "As a general rule, the plaintiff in a tort action must prove by a preponderance of the evidence that the defendant's conduct was the factual and proximate (or legal) cause of its injury." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig*., 739 F. Supp. 2d 576, 596 (S.D.N.Y. 2010). This requires Celsius to plausibly allege that Cloudflare's conduct was the "substantial factor" in producing Celsius's injury. *Id.*; *Canals v. Tilcon New York, Inc*., 135 A.D.3d 683, 684 (2016) (quoting *Lapidus v. State of New York*, 57 A.D.3d 83, 94 (2d Dep't 2008)) ("[T]he

17

plaintiff in a negligence action 'must generally show that the defendant's negligence was a substantial cause of the events which produced the injury.'"). In determining the sufficiency of causation allegations, New York courts look to several factors set out in the Second Restatement of Torts, including, *inter alia*, the "number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it," and "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible." *In re MTBE Prods. Liab. Litig.*, 739 F. Supp. 2d  at 596 (citing RESTATEMENT (SECOND) OF TORTS § 433).

Barely attempting to plead causation, Celsius summarily avers that Cloudflare's supposed "breach" was the "proximate and but-for cause of Celsius's injury." Compl. ¶¶ 85-86. But that bare legal conclusion is belied by a slew of other allegations in the Complaint. Celsius, for example, admits that Spadafora and his team at BadgerDAO "failed to implement basic security protocols that could have prevented the hack on BadgerDAO's end, such as rotating key passphrases." Compl. ¶ 12. Celsius further points to numerous security measures that BadgerDAO undertook only after the hack, including multifactor authentication, password changes, and the rotation of key passphrases. *Id.* ¶ 69. BadgerDAO belatedly took these steps "recognizing that its [prior] security measures had been inadequate." *Id.* The obvious inference is that BadgerDAO's failure to implement these security measures before the hack was the proximate cause of the hack—not any alleged conduct of Cloudflare.

In stark contrast to the Complaint's detailed allegations about BadgerDAO's conduct, the allegations about ***Cloudflare*** are reed-thin. Celsius merely alleges that Cloudflare should have purportedly required "e-mail verification" earlier in the process of setting up an account, rather

than at the stage of activating an API key, which Celsius concedes serves as a "validation mechanism." Compl. ¶¶ 44, 60. According to Celsius, Cloudflare should have known (and even warned unknown and unidentified customers of customers) that malicious infiltrators could potentially register for a Cloudflare account; create or view *inactive* API keys "before email verification was completed"; and lie-in-wait for a legitimate user to click on the verification link and activate the API key. *Id*.

By the Complaint's own account, however, there were myriad intervening steps—all by third-party actors having nothing to do with Cloudflare—that occurred before there was any theft of Celsius's funds. These include: (i) a third-party hacker creating a Cloudflare account; (ii) a BadgerDAO developer mistakenly clicking on an email verification link that they did not generate; (iii) a hacker inserting malicious code into BadgerDAO's app; (iv) a legitimate user initiating a transaction through BadgerDAO's app; (v) a hacker's interception of the transaction and insertion of a "rogue request"; (vi) a "user related to Celsius" mistakenly approving the "rogue request"; and (vii) a hacker's withdrawal of funds from the user's account. *See* Compl. ¶¶ 54-56, 65-69. Taking just one such (critical) step as an example, the Complaint provides no details about the "user related to Celsius" who allegedly "approved a rogue request" on December 1, 2021—not the user's identity, the circumstances underlying his review and approval of the "rogue request," or whether the user himself acted negligently or even criminally in doing so. *Id.* ¶ 68.

Even after the hack, the Complaint describes still more conduct by individuals having nothing to do with Cloudflare. As Celsius admits, *one of its own employees* "accidentally withdrew" the remBadger tokens that BadgerDAO had provided to Celsius as restitution for the stolen funds. *See supra* Statement of Facts, § E; Compl. ¶ 75. This negligent action "forfeited" Celsius's right to any additional recovery beyond the $6 million that it already recovered. *Id.*

Celsius should not be able to now rectify that error by seeking compensatory damages from Cloudflare.

At bottom, the hopelessly attenuated causal chain depicted in the Complaint epitomizes "a situation harmless unless acted upon by other forces for which the actor is not responsible," as articulated by the Restatement of Torts. And given this labyrinthine chain of events involving multiple parties independent of Cloudflare, "there can be no direct link between the alleged misconduct of [Cloudflare] and the alleged damage to [Celsius], as the damage to [Celsius] is remote, indirect, and derivative of third parties." *E. States Health & Welfare Fund v. Philip Morris, Inc.*, 188 Misc. 2d 638, 645, 649 (Sup. Ct. N.Y. Cnty. 2000) (dismissing negligence claim where "the law clearly requires a showing of proximate cause for the Funds to recover, and [] such a showing has not been made"); *Royal v. New York City Hous. Auth.*, 127 A.D.3d 534, 535 (1st Dep't 2015) (affirming dismissal of negligence claim where "[plaintiff's] deliberate intervening act of attempting to leave the building through an eighth-floor window was the sole proximate cause of her injuries").

For similar reasons, the Complaint also has not adequately pleaded that any alleged injury was or could have been "reasonably foreseeable" to Cloudflare. As discussed above, among the several ensuing intervening acts here was the criminal activity of unknown malicious hackers. Under New York law, "an intervening criminal act will itself generally sever the chain of events between a defendant's earlier wrongful conduct and a plaintiff's resulting injury," unless the "third party's criminal act was reasonably foreseeable to the earlier acting defendant." *Martin v. City of New York*, 793 F. Supp. 2d 583, 589 (E.D.N.Y. 2011); *Pink v. Rome Youth Hockey Ass'n*, 28 N.Y.3d 994, 998 (2016) (dismissing negligence action and finding that "criminal assault on plaintiff was not a reasonably foreseeable result of any failure to take preventive measures . . .

20

particularly since such an assault had never happened before"); *King v. Diplomat Hosp. Grp., LLC*, 218 A.D.3d 454, 455 (2nd Dep't 2023) (affirming dismissal of negligence action against hotel owner because the criminal act was "not foreseeable" to defendant despite prior criminal incidents on the premises, as "the prior incidents were not the same or similar to the subject occurrence").

Particularly given its lack of any connection to Cloudflare, it is not enough for Celsius to summarily assert that it was "foreseeable" to Cloudflare that "malicious actors" may have infiltrated BadgerDAO's platform "before the bug was remedied." *Id.* ¶ 84. Celsius never alleges, for example, ***why*** it would have been reasonably foreseeable to a service provider like Cloudflare that a customer like BadgerDAO would opt to use Cloudflare's ***free*** services for securing the accounts of unknown investors worth tens of millions of dollars. *See In re Sony Gaming Networks & Consumer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 969 (N.D. Cal. 2014) (dismissing plaintiffs' injury claims arising from data breach for lack of foreseeability and "causal connection," where plaintiffs conceded that "access" to defendant Sony's services "is free" and that they "did not purchase premium [Sony] services"). Nor would it have been reasonably foreseeable to Cloudflare that one of its free customers, BadgerDAO, would not have had its own industry-standard security measures in place (*e.g.*, rotating key passphrases, multifactor authentication, and password changes). It also makes no sense, as a policy matter, to suggest that a company like Cloudflare, offering free services online, should reasonably foresee the criminal activity of strangers, particularly when no prior known comparable criminal activity has been identified. *See Novikova v. Greenbriar Owners Corp.*, 258 A.D.2d 149, 153 (2d Dep't 1999) ("[T]o establish foreseeability, the criminal conduct at issue must be shown to be reasonably predictable based on the prior occurrence of the same or similar criminal activity at a location sufficiently proximate to the subject location."). "Under these circumstances," to hold a criminal hack to be a "foreseeable

consequence" of Cloudflare's offer of free services online "is to stretch the concept of foreseeability beyond acceptable limits." *Ventricelli v. Kinney Sys. Rent A Car, Inc.*, 45 N.Y.2d 950, 952 (1978). Celsius's allegations thus fail to adequately allege proximate causation.

## II.    CELSIUS FAILS TO STATE A GROSS NEGLIGENCE CLAIM

Celsius's gross negligence claim against Cloudflare can be easily dispensed with. Gross negligence "differs in kind as well as degree from ordinary negligence." *Kinsey v. Cendant Corp.*, 2005 WL 1907678, at *7 (S.D.N.Y. Aug. 10, 2005); *accord Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24 (1993). To state a gross negligence claim, Celsius must plausibly allege the three elements of an ordinary negligence claim discussed above, "plus a fourth element," that is, facts suggesting conduct that "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *AT&T*, 83 F.3d at 556 (internal quotation marks omitted); *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 368 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 7 (2d Cir. 2009); *Curley*, 153 F.3d at 13 ("the act or omission" constituting gross negligence "must be of an aggravated character, as distinguished from the failure to exercise ordinary care"). "Recklessness in the context of a gross negligence claim means 'an extreme departure from the standards of ordinary care.'" *D'Amico v. Waste Mgm't of New York, LLC*, 2019 WL 1332575, at *8 (W.D.N.Y. Mar. 25, 2019) (citation omitted). A party is thus only "grossly negligent when it fails to exercise even slight care or slight diligence." *Corley v. Vance*, 365 F. Supp. 3d 407, 455 (S.D.N.Y. 2019).

For all of the reasons discussed in Section I, *supra*, Celsius's gross negligence claim necessarily fails because it has not adequately pleaded the elements of an ***ordinary*** negligence claim—*i.e.*, that Cloudflare owed it a duty of care; that Cloudflare breached that non-existent duty; or that any act or omission of Cloudflare was the proximate cause of its damages. *See* Argument, § I; *see also Pasternak v. Lab'y Corp. of Am.*, 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012) ("Where

22

a claim for ordinary negligence fails, a gross negligence claim necessarily fails."); *Farash*, 574 F. Supp. 2d at 368 ("Because plaintiff has failed to make out a claim for ordinary negligence, his claim for gross negligence must necessarily fail.").

In addition, Celsius has not come close to pleading "reckless" conduct or "intentional wrongdoing" by Cloudflare sufficient to state a gross negligence claim under *AT&T* and its progeny. 83 F.3d at 556. The sum total of Celsius's factual allegations underlying this claim is that Cloudflare was "made aware" of a potential vulnerability with respect to API keys through an online forum, but did not "immediately remedy the vulnerability" or notify BadgerDAO that its "APIs . . . might have been compromised." Compl.¶¶ 92-94. For several reasons, these sparse allegations do not meet the heightened degree of culpability required of a gross negligence claim.

*First*, the Complaint itself acknowledges that Cloudflare responded to the user notification within two days and "confirmed that [it] will make changes to the sign up process based on the recent increase of unrecognized sign up reports." *Id.* ¶ 64; *see also* ¶ 84 (alleging that the "flaw" was "fixed"). This admission flatly contradicts the Complaint's naked legal conclusion that Cloudflare purportedly failed to exercise "even slight care or diligence in fixing . . . a known issue." *Compare id. with* ¶ 94; *Faber v. Met. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (courts are not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions"). Accordingly, to the extent that Celsius's gross negligence claim is premised on a supposed failure to "fix" the potential vulnerability, it has "plead[ed] [itself] out of court by alleging facts which show that [it] has no claim." *Wireless Ink Corp.*, 787 F. Supp. 2d at 307.

*Second*, Cloudflare could not have acted "recklessly" or with "intentional wrongdoing" by failing to warn Celsius—a non-customer—of a potential "vulnerability," particularly where there are no allegations that Cloudflare knew that the "vulnerability" was even real or that anyone's

23

accounts were actually compromised. *AT&T*, 83 F.3d at 556; Compl.¶ 92. As discussed above, Celsius's "failure to allege a relationship [with Cloudflare] sufficiently approaching privity prevents recovery under *any* negligence theory, including gross negligence." *Thomas H. Lee Equity Fund V, L.P.* v. *Grant Thornton LLP*, 586 F. Supp. 2d 119, 130 n. 7 (S.D.N.Y. 2008) (internal quotation marks omitted) (collecting cases); *Sterling Nat'l Bank v. J.H. Cohn LLP*, 2013 WL 4467401, at *3-4 (Sup. Ct. N.Y. Cnty. Aug, 20, 2013) (dismissing gross negligence claim where parties were "undisputedly not in privity"). Tellingly, Celsius's own Complaint alleges that Cloudflare failed to "notify[] **BadgerDAO** of a known issue," not BadgerDAO's users. Compl. ¶ 94 (emphasis added).

*Third*, and in any event, merely having "access to information," but not conveying it to a third party, "does not meet the heightened standard necessary to state a claim for gross negligence" as a matter of law. *See Kinsey*, 2005 WL 1907678, at *7 (dismissing gross negligence claim premised on failure to disclose information about the alleged expiration date of awarded options). "To conclude otherwise would convert an allegedly negligent transmission of information into one for gross negligence," which finds no support in New York law. *Id.; see also*, *e.g.*, *Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013) (allegations that plaintiff "may have had access to information about the account which should have been protected" and engaged in other "commercially unreasonable" conduct were "insufficient to plead gross negligence" absent facts amounting to "malice, recklessness, or callous indifference on the part of Morgan Stanley").

*Finally*, the Complaint never alleges that Cloudflare acted recklessly or with the intention of harming Celsius (or anyone else). This omission is fatal, because "[u]nder New York law, a mistake or series of mistakes alone, without a showing of recklessness, is insufficient for a finding

24

of gross negligence." *In re Enron Corp.*, 292 B.R. 752, 767-68 (Bankr. S.D.N.Y. 2002) (quoting

*Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 204 F. Supp. 2d 639, 645 (S.D.N.Y. 2002)).

## JURY TRIAL DEMAND

28 U.S.C. § 157(e) provides that "[i]f the right to a jury trial applies in a proceeding that

may be heard . . . by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if

specially designated to exercise such jurisdiction by the district court and with the express consent

of all the parties." Pursuant to 28 U.S.C. § 157(e), Cloudflare does not consent to a jury trial to be

conducted by the Bankruptcy Court and expressly preserves the right to a jury trial conducted by

the District Court.

## CONCLUSION

For the foregoing reasons, the Court should dismiss with prejudice the claims against

Cloudflare pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Dated: October 15, 2024

By: */s/ Matthew D. Ingber*
Matthew D. Ingber
Niketa K. Patel
Joaquin M. C de Baca
David Yolkut
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  +1.212.506.2373
Email:  mingber@mayerbrown.com

*Attorneys for Defendant Cloudflare, Inc.*

25